**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| M.J., et al., | ) | CASE NO. 5:18-cv-577 |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| AKRON CITY SCHOOL DISTRICT | ) | |
| BOARD OF EDUCATION, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | CASE NO. 5:18-cv-870 |
| | ) | |
| M.H., et al., | ) | |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| AKRON CITY SCHOOL DISTRICT | ) | |
| BOARD OF EDUCATION, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

MEMORANDUM OPINION AND ORDER

In these consolidated civil rights actions, the parties have completed discovery, and each defendant has sought summary judgment. (Case No. 5:18-cv-577 [hereinafter the "M.J. Case"], Doc. Nos. 86, 87; Case No. 5:18-cv-870 [hereinafter the "W.H. Case"], Doc. Nos. 99, 102.) All motions are fully briefed and ripe for resolution.

## I.  BACKGROUND

These actions share a general core of facts and involve the April 2017 activities of defendant Christopher Hendon ("Hendon") at Leggett Community Learning Center ("Leggett") in Akron, Ohio. Leggett, a public school within defendant Akron City School District (the "District"), is an elementary school with an enrollment of approximate 380 students in grades kindergarten through fifth. (Deposition of Philomena Vincente ["Vincente Dep."] at 21–25.)[1] At all times relevant to these lawsuits, defendant David James ("James") was the superintendent of the District, and defendant Philomena Vincente ("Vincente") was the principal of Leggett. The District, James, and defendant Akron City School District Board of Education ("Board") constitute the "administrative defendants" in both actions.

In 2017, approximately 60% of the Leggett student body was African-American. (*Id.* at 8–9.) Twenty percent of the African-American students at Leggett were issued Individualized Education Plans ("IEPs"), which are plans that support and accommodate children with learning and behavioral disabilities. (*Id.*) The community Leggett served was economically disadvantaged, and many of Leggett's students were also living in federally subsidized housing. (*Id.* at 9.)

It was not uncommon for members of the Akron Police Department ("APD") to visit Leggett. (*Id.* at 81.) In 2017, there was an on-going initiative by the APD whereby officers would visit Leggett and other District schools to conduct "walk-throughs" once or twice a week. (*Id.*; *see* Deposition of Dan Rambler ["Rambler Dep."] at 17–19, 34.) The purpose of these periodic

---

[1] Because the deposition transcripts and excerpts from the depositions were filed at various places on the dockets of the consolidated cases, for ease of reference, all deposition page numbers appearing in this memorandum opinion refer to the page number assigned by the court reporter. All other page numbers refer to the page identification number generated by the Court's electronic docketing system.

walk-throughs was two-fold: First, the walk-throughs permitted officers to familiarize themselves with the layout of the school buildings in the event of a crisis. (Vincente Dep. at 81; Rambler Dep. at 78–19.) Second, the walk-throughs provided opportunities for officers to build rapport with students and staff. During these visits, officers were encouraged to engage with the students in the lunchroom and even play basketball with the students on the playground. (Vincente Dep. at 81–83.) Members of the APD might also be called to respond to particular criminal or dangerous situations occurring on school property. APD police officers, however, were not supposed to enforce school rules or assist in the discipline of the students. (Vincente Dep. at 83; Rambler Dep. at 16, 34.)

The Board also employed police officers who were responsible for providing security in the schools. Board officers wear a uniform and a badge that reads "Akron BOE Police." (Deposition of Donald Good-Johnson ["Good Dep."] at 10.) A Board officer's duties include patrolling the schools and responding to safety issues involving students, parents, and other members of the public. (*Id*. at 15.) Additionally, the District entered into a contract with the APD to provide "resource officers" to be permanently stationed in certain schools. (Rambler Dep. at 16–17.) Resource officers were responsible for maintaining security in their assigned schools. Elementary schools, such as Leggett, did not have resource officers, and, instead, relied on Board officers who were responsible for multiple schools. (Vincente Dep. at 80; Rambler Dep. at 8, 17; Good Dep. at 15–16.)

3

Office secretary Holly DeLisi ("DeLisi") testified that Leggett has an electronic locking system, and that she is required to "buzz" in visitors.[2] (Deposition of Holly DeLisi ["DeLisi Dep."] at 21; *see* Vincente Dep. at 50–51.) Once a visitor is buzzed in, they are supposed to report to the school office to sign in on the school's sign-in registry. (Rambler Dep. at 19; Vincente Dep. at 48, 54.) After a visitor signs in, he or she is issued a visitor's pass that is to be visible on the person at all times. (Vincente Dep. at 54.) Numerous witnesses testified that while all visitors are supposed to sign in, police officers were often informally exempted from this requirement. (Vincente Dep. 54–55; Rambler Dep. at 19; *see* Deposition of Patricia Derita ["Derita Dep."] at 19–20; DeLisi Dep. at 10, 14.)

Hendon visited Leggett for the first time on April 6, 2017, on a day that was particularly frenetic. Immediately prior to 1:30 that afternoon, Vincente asked DeLisi to contact the mother of a boy who was misbehaving to take him home. (Vincente Dep. at 111–13[3].) The mother initially agreed to pick up the boy but called back fifteen minutes later and said that her boyfriend, whom she indicated was a police officer, would come and get the child. (*Id.* at 115–16.) Vincente admitted that, at the time, she questioned whether the mother really was dating a police officer, but she believed that she would find out when the individual came to pick up the boy. (*Id.* at 116–17, 173.)

At approximately the same time, a different mother called the school office and reported that her husband was high on drugs and was coming to Leggett to attempt to remove their

---

[2] As a matter of practice, DeLisi buzzed in all visitors. She explained that, because the school did not have metal detectors, she would have no way to know whether a potential visitor had a gun or otherwise posed a threat to students and staff. (DeLisi Dep. at 21.)

[3] Vincente was uncertain whether she initially placed the call to the mother or asked DeLisi to do it. (Vincente Dep. at 113.)

children from the school. In this call, the mother shared her concern that her husband intended to commit suicide in front of the children. (Vincente Dep. at 135–37.) DeLisi called the District's security office and the APD to request assistance with the matter. (DeLisi Dep. at 32.) When the father arrived at the school and attempted to remove his son from music class, Vincente intervened until members of the APD could arrive. (Vincente Dep. at 137.) Ultimately, the crisis was averted when the father, upon seeing an APD cruiser pull up in the school parking lot, fled the building; he was eventually apprehended by law enforcement. (*Id*. at 137–39.)

While the situation with the suicidal father was still unfolding, Hendon arrived at the school. He drove up in a white unmarked sedan. (*Id*. at 181.) From her office window, Vincente saw Hendon outside the school. Hendon was wearing a black police uniform, a bullet proof vest, handcuffs, and a badge with black tape on it. (*Id*. at 125–28, 133; DeLisi Dep. at 32–33.) Witnesses testified that Hendon's uniform resembled the uniform worn by SWAT officers on police shows. (Derita Dep. at 40; *see* DeLisi Dep. at 76.) Vincente observed Hendon in the parking lot speaking with the APD police officers who had been summoned to address the issuing involving the suicidal father. (Vincente Dep. at 125; DeLisi Dep. at 32, 34, 36.)

Hendon also spoke with Officer Donald Good-Johnson ("Good"), a Board officer who was assigned to Leggett as part of his route and had also been dispatched to Leggett that day to address the crisis.[4] (Vincente Dep. at 126; Good Dep. at 31, 34.) Hendon approached Good and asked if he remembered him. When Good hesitated, Hendon explained that he had been a student at a school in the District that Good often patrolled. He told Good that he now worked for the juvenile court diversion program. (*Id*. at 35–37.) While Good knew from Hendon's uniform that

---

[4] Good explained that he is employed by the Board and is also a reserve officer with the APD. (Good Dep. at 7–8.)

he was not an Akron police officer, Good believed that the uniform was consistent with uniforms worn by court diversion personnel. (*Id*. at 41–43.)[5] Hendon shook Good's hand before being buzzed into the building. (*Id*. at 37.)

Hendon walked into Vincente's office where Vincente and the boy who had been misbehaving earlier in the day were waiting. Hendon advised Vincente that he was there to pick up the boy. He asked the boy what kind of trouble he was in, raising his voice and telling the boy that he cannot act that way in school. (Vincente Dep. at 128.) Hendon then explained to Vincente that he was currently talking to the Akron City Counsel about instituting a "scared straight" program in the schools. (*Id*. at 129–30.) Hendon remained at Leggett that day from approximately 1:30 p.m. until dismissal at 3:30 p.m.—speaking with staff in the office—before he ultimately left with his girlfriend's son. (*Id*. at 133–135, 139–40.)

Hendon returned to Leggett the next day (April 7, 2017) around 8:30 a.m. and, within fifteen minutes of his arrival, he was joined by a man dressed in street clothes named James. (Vincente Dep. at 140–41, 147–48.) Hendon and James spoke again with Vincente. James introduced himself and indicated that he worked at the Juvenile Detention Center.[6] (*Id*. at 148–49.) Hendon advised Vincente that he had just gotten off his shift and had decided to come over because he wanted to speak with some of the teachers and students about the scared straight program he and James wanted to start in Akron. (*Id*. at 140–41.) During their 20-minute conversation, Hendon mentioned the success he had at a local private school and showed Vincente a picture on his phone of him in full uniform shaking hands with the Mayor of Akron.

---

[5] Good testified that he knew that Hendon was not a police officer because his uniform did not have certain insignia common to police officers, such as patches with stripes on them. (*Id*. at 41–43.)

[6] Vincente noticed the initials "JDC" on the side of James' car. (Vincente Dep. at 148–50.)

(*Id*. at 142.) He also asked Vincente whether she would be willing to arrange a meeting with the parents of the school to discuss the program. Vincente refused to set up the meeting and informed Hendon that he would not be permitted to start such a program at Leggett.[7] (*Id*.) Hendon and James spent the afternoon at Leggett speaking with teachers and students. (*Id*. at 156–57.)

Over the next few days, Hendon visited the school several times, with and without James, and interacted with staff, parents, and students.[8] (*Id*. at 158–60.) During this time period, he also met with students and parents away from Leggett. There is no dispute that Hendon was never employed by the District, that he was not a police officer with any police force, and that he had no legitimate affiliation with any juvenile court diversion program. On April 26, 2017, Hendon was arrested and charged with numerous offenses, including impersonating a police officer, kidnapping, bringing a gun into a courthouse, and criminal trespass at the Summit County Juvenile Court in Summit County Case No. CR-2017-04-1474. He pled guilty and was incarcerated.

Following Hendon's arrest, numerous federal lawsuits were filed, including the consolidated actions on the undersigned's docket. Hendon's interactions with Leggett administrators, teachers, parents, and students form the basis for these lawsuits. The particularized facts of the present consolidated cases are separately detailed below.

---

[7] Vincente testified that she was aware that scared straight programs were not sanctioned by the District. (*Id*. at 143.)

[8] It is undisputed that Hendon never signed in as a visitor to Leggett.

### A.      Facts Underlying the M.J. Case

The facts related to the allegations in this case are pieced together from various participants' recollections. Plaintiff M.J., a student at Leggett, testified that he first met Hendon on April 6, 2017. M.J. had left his class, taught by defendant Jennifer Ramon ("Ramon"), because he was upset and was heading to the school office to speak with Vincente when he ran into Hendon. (Deposition of M.J. ["M.J. Dep."] at 21–24.) The two briefly exchanged names before M.J. returned to his class. (*Id*. at 22–24.)

The next day (April 7, 2017), Ramon called "administration" to report that M.J. was becoming aggressive in her classroom. (Deposition of Jennifer Ramon ["Ramon Dep."] at 30–31; *see* M.J. Dep. at 43–44.) Hendon appeared a minute or two later and took M.J. out of the classroom. (Ramon Dep. at 30–31, 50; M.J. Dep. at 44.) Hendon walked M.J. to the main office and asked Vincente if there was an open room. She replied that there was a room across from the office. (M.J. Dep. at 44.) Hendon took M.J. into the room, closed the door where no one could see in, and proceeded to swear at M.J. and throw him against the wall. (M.J. Dep. at 45–49.) He also threw M.J. into a table and chairs and called him a "bitch" and "nigger." (*Id*. at 43–48.) Additionally, Hendon told M.J. to stop acting up. (*Id*. at 49.)

Hendon and M.J. returned to the classroom about 10 minutes later. (Ramon Dep. at 33.) Presumably on their way back to M.J.'s classroom, Hendon asked an office secretary for the report cards of M.J. and several other students. (M.J. Dep. at 81–82.) The secretary supplied the requested information.[9] (*Id*.) M.J. then wrote his mother's phone number down on his report card

---

[9] Vincente testified that, pursuant to school policy, all student records are confidential and are to be accessed only by the student's parents and school personnel. (Vincente Dep. at 52–53.)

and gave it to Hendon. (*Id*. at 97–98.) When Hendon returned M.J. to his classroom, M.J. apologized and picked up the items he had thrown, and Hendon left. (Ramon Dep. at 39, 42.)

Later that same day (April 7, 2017), M.J. was playing with another boy outside at recess, doing backflips. (M.J. Dep. at 51.) A special education teacher saw this and went to tell Hendon. (*Id*. at 51–52.) Hendon told M.J. and the other boy to follow him inside. (*Id*.) Hendon took the two boys to the empty cafeteria and behind a curtain in an area used as a stage, so that "nobody could see." (*Id*. at 53.) He made the boys do exercises—including 100 push-ups, 100 wall sits, 100 sit-ups, and 100 jumping jacks—before instructing them to return to their class. (*Id*. at 53–54.) The boys did not tell Ramon what had happened.[10] (*Id*. at 55.)

M.J.'s mother, plaintiff S.J. ("S.J."), reported that she received a voice mail from James, in which he explained that he thought M.J. would benefit from participating in a scared straight program with the District. (Deposition of S.J. ["S.J. Dep."] at 98–100.) James called back and explained that he was working with "Officer Hendon" and the Akron Public Schools in a scared straight program to "save youth." (*Id*. at 100–02.) When S.J. did not call back as she had promised to discuss the matter further, James called S.J. a third time. This time, S.J. "invited him and Officer Hendon to meet" at M.J.'s basketball game that Saturday, April 8, 2017, at the YMCA. (*Id*. at 102, 208.) S.J. confirmed that James was "very clear" that Hendon was a police officer with the APD. (*Id*. at 118.)

On April 8, 2017, Hendon and James met with S.J. at the basketball game at the YMCA. James arrived first, and Hendon arrived 10 minutes later. (*Id*. at 110.) S.J. thought Hendon's

---

[10] In a third incident that day or the next, Ramon called for "administration" again. (Ramon Dep. at 48.) Hendon appeared within a minute or two and took three boys, including M.J., out of the classroom. (*Id*. at 49, 51.) Ramon heard Hendon tell the boys that they had a contract with him and that he was going to pay them $100 if they made the merit roll. (*Id*. at 52.) They all returned to the classroom 10 minutes later and apologized. (*Id*. at 55–56.)

uniform looked more like one worn by SWAT team members than patrol officers. (*Id.* at 118–19.) S.J. did not ask Hendon for additional identification because it was not her practice to question police officers. (*Id.* at 125–27.) James brought M.J. to the table where Hendon and S.J. were seated and presented S.J. with her child's report card. (*Id*. at 110–11.) Hendon discussed the scared straight program and his mission as a resource officer for the APD. (*Id.* at 111–12.) He explained that he wanted to take M.J. and a few other children to the Juvenile Detention Center and then to pick up garbage. He indicated that he would need to handcuff M.J., but that they would do it outside of the YMCA so as not to embarrass him. (*Id*. at 138–41.) James handed S.J. a permission form to work with M.J. in the program, and S.J. signed it.[11] (*Id*. at 111, 158.) She also gave the men permission to work with M.J. at school. (*Id.* at 145.) The men took M.J. and another child outside, handcuffed M.J., and then loaded the children into their cars. (*Id*. at 148–49.) Hendon dropped M.J. off several hours after having taken M.J. and a few other boys to pick up trash outside the Dollar General. (*Id*. at 154.)

The following Tuesday, April 11, 2017, S.J. received a phone call from Vincente, who explained that S.J. was having trouble in class. Vincente indicated that Hendon was going to take M.J. across the hall from the office "and have a stern talking to" with him. (*Id*. at 161–62, 214–15.)  S.J. did not object, as she had previously told Hendon that he could work with her son at school. (*Id*. at 145, 163.)[12] Vincente did not say anything about Hendon running a scared straight program. (*Id.* at 166.) Vincente and S.J. spoke again after the news story regarding Hendon's arrest had aired, and S.J. informed Vincente that Hendon was a fraud. Additionally, it was after

---

[11] S.J. recalls that the permission form had the words "Akron Public Schools" in the heading. (*Id*. at 111.)

[12] Vincente also remembered calling S.J. before Hendon spoke with M.J., and that S.J. had given permission for her son to work with Hendon at school. (Vincente Dep. at 213–14.)

seeing the news story that M.J. reported for the first time that Hendon had thrown him against a wall. (*Id*. at 174–75, 182.)

On March 13, 2018, S.J., on behalf of herself and M.J., brought suit against the administrative defendants and Vincente, Ramon, and Hendon. (*See* Doc. No. 1 (Complaint).) In the complaint, plaintiffs raise claims under 42 U.S.C. § 1983 for substantive due process, equal protection, and supervisory liability/failure to train. They also raised federal claims under the Rehabilitation Act ("RA"), the Americans with Disability Act ("ADA"), and Title VI, as well as numerous state tort claims. (*Id*.)

### B.    Facts Underlying the W.H. Case

Defendant Teresa Morrison ("Morrison") was an intervention specialist at Leggett, and, in the Spring of 2017, plaintiff W.H. was a student in Morrison's class.[13] (Deposition of Teresa Morrison ["Morrison Dep."] at 6, 9, 39.) Plaintiff M.H. is W.H's mother. Morrison testified that she first met Hendon on April 6, 2017 in front of the office after she dropped off a student. (*Id*. at 13, 18–19.) Hendon introduced himself to Morrison and said he was "with the Scared Straight Program." (*Id*. at 18.) Morrison thought his uniform looked like those worn by other officers she had seen at Leggett. (*Id*. at 26–30.) She asked Hendon if he worked with the APD and whether he knew a friend of hers. Hendon responded that he did work for the APD and that he did know Morrison's friend. (*Id*. at 22.) Morrison believed Hendon was an APD officer.[14]

---

[13] Morrison testified that an intervention specialist is responsible for the academic needs of students with behavioral and emotional challenges. (Morrison Dep. at 9.)

[14] Her belief was reinforced by subsequent encounters she had with Hendon over the next few days at Leggett. After dropping her class off at a music lesson, Hendon approached her and showed her ten images from Facebook on his phone, which included Hendon inside the JDC and Hendon presenting to a large group of children. (*Id*. at 34–36.) Morrison also remembered seeing Hendon interact with Officer Good. On more than one occasion, she also saw him interact with her class when they would pass in the halls. (*Id*. at 23–24, 31–32, 86.)

In the early afternoon of April 7, 2017, Morrison collected her class from gym. (Morrison Dep. at 39–41.) W.H. had gotten in a fight with another student during gym class and the fight was still going on when Morrison arrived. (*Id*.) After Morrison separated the students, she took W.H. to the office to speak with Vincente. (*Id*. at 41–43.) Vincente asked Morrison to call M.H. to come and get W.H. (*Id*. at 44.) Morrison complied, and, while she was on the phone with M.H., Hendon approached and asked to speak with M.H. (*Id*. at 44–45.) Morrison handed Hendon the phone, and Hendon walked away so that Morrison could not hear the conversation. (*Id*. at 45–46.) When Hendon returned, he advised Morrison that M.H. was on her way. (*Id*. at 47.)

In that phone call, Hendon informed M.H. that he was an officer with the scared straight program. (Deposition of M.H. ["M.H. Dep."] at 76–77.) Hendon explained that W.H. had been acting poorly and that he wanted her to come to school to speak with him. (*Id*. at 77–78.) Hendon told her to accept the choice to either come to the school to discuss W.H's behavior or allow him to take W.H. to the juvenile detention center. (The W.H. Case, Doc. No. 112-32 (Affidavit of M.H. ["M.H. Aff."]) ¶ 6.) M.H. immediately left for the school. (M.H. Dep. at 78.)

When M.H. arrived at Leggett, she saw Hendon, James and Morrison in the hallway outside W.H.'s classroom. (*Id*. at 76, 78, 80.) Even before Hendon introduced himself, M.H. believed Hendon was a police officer because he was dressed like a SWAT officer and "used all the right credentials that a police officer would use." (*Id*. at 89–90.)

Hendon explained that he was not really going to take W.H. to jail but was going to handcuff him and escort him to the office. (*Id*. at 82.) The mother asked if she could record the event with her phone because she "was going to show my mother and my family" that W.H. was

12

"acting out in class" and was going to be "arrested[.]" (*Id.* at 32, 83–84.) Hendon agreed and M.H. recorded the encounter.[15] Hendon then handcuffed W.H., and he, Morrison, and M.H. accompanied W.H. to the office. (*Id.* at 82.) Once inside the office, Hendon sat W.H. down next to another boy. (*Id.* at 93–94.) M.H. recalled seeing two other children in the office handcuffed together during this time. (*Id.* at 94.) Hendon left M.H. and a handcuffed W.H. in the office until the end of the day. (*Id.* at 98.) When the final bell rang, Hendon asked M.H. if he could drive W.H. home in his "cruiser car." (*Id.* at 100–01.) M.H. agreed but asked Hendon if he could remove the handcuffs, which Hendon did. (*Id.* at 100–04.)

On April 17, 2017, M.H., on her own behalf and on behalf of W.H., brought suit against the administrative defendants, Vincente, Morrison, and Hendon. (Doc. No. 1 (Complaint).) Plaintiffs raise federal and state claims similar to those advanced in the M.J. Case. (Doc. No. 31 (First Amended Complaint).)

## II. Summary Judgment

### A.   Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the

---

[15] Several office personnel saw M.H. recording the incident and believe that she was "laughing" while her child was visibly upset. (DeLisi Dep. at 52; Morrison Dep. at 50.) M.H. denies this, and there no longer appears to be a complete recording of the incident. This factual dispute is not relevant to the Court's consideration of the summary judgment motions.

13

fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and

unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 487 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

### B. Evidence on Summary Judgment

Plaintiffs in both cases rely heavily upon interviews of various parties and other individuals, who were later interviewed as part of the post-arrest investigation conducted by the APD. As defendants note, plaintiffs' opposition briefs toggle between citations to depositions, which are properly considered under Rule 56, and the police interviews, which are not. "A party seeking or opposing summary judgment may rely on deposition transcripts, electronically stored documents, affidavits, declarations, and other materials." *Beans v. City of Massillon*, No. 5:15-cv-1475, 2016 WL 7492503, at *6 (N.D. Ohio Dec. 30, 2016) (citing Fed. R. Civ. P. 56(c)(1)(A)). "It is well settled[, however,] that a court may not consider hearsay when deciding a summary judgment motion." *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012) (unsworn witness statements taken during a police investigation were properly excluded from consideration on summary judgment). In *Beans*, this Court held that a civil rights plaintiff could

15

not rely on unsworn interview transcripts to defeat summary judgment because they were hearsay that did not otherwise qualify as a deposition transcript, electronically stored documents, affidavits, declarations, or other material that the Court may properly consider under Rule 56. *Beans*, 2016 WL 7492503, at *7.

A similar result is warranted here. While the "transcripts" of the police interviews were prepared by a court reporter who swears they are accurate, the statements contained in the transcripts are unsworn and therefore inadmissible. *See, e.g., Purdy v. Newland*, No. 93-2110, 1994 WL 601341, at *1 n.1 (6th Cir. Nov. 2, 2010) (transcript of private investigator's unsworn interviews could not be considered on summary judgment); *see also Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968–69 (6th Cir. 1991) ("[A] court may not consider unsworn statements when ruling on a motion for summary judgment."). Moreover, the fact that the unsworn transcripts were produced during discovery does not cure the fact that they contain inadmissible hearsay. *See Pollino v. City of Phila.*, No. Civ. A. 03-6288, 2005 WL 372105, at *7 (E.D. Pa. Feb. 15, 2005) ("The unsworn statements alleged to be incorporated by reference in the interrogatory answer are clearly nothing more than hearsay that would not be admitted at trial for substantive purposes" and "is not considered when reviewing a motion for summary judgment.") (citing *Adickes*, 398 U.S. at 159 & n. 19).

There is no indication from the police interview transcripts that the interviewees were ever sworn in, as a witness is before a deposition, or that the interviewees were given an opportunity to review the transcription and correct any errors. Moreover, even though most of the police interviews cited in the opposition briefs were given by individuals who were deposed during discovery in these cases, plaintiffs' counsel elected not to remedy the hearsay contained

in the interview transcripts by presenting the deponents with the audio or written transcripts and asking them to adopt or explain their previous statements. Because the police interviews do not constitute competent evidence under Rule 56, the Court may not consider them in deciding the present summary judgment motions.

In the W.H. Case, plaintiffs also rely on an affidavit offered by M.H., sworn after her deposition, in which she makes statements that are inconsistent with her deposition testimony. (*See* M.H. Aff.) It is well settled that a party may not contradict earlier deposition testimony by subsequently offering an inconsistent affidavit. *See Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 789 (6th Cir. 2002) (citing, among authority, *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997)).

The Sixth Circuit has set forth a two-step analysis for district courts deciding the admissibility of a post-deposition affidavit at the summary judgment stage. *See Aerel, SRL v. PCC Airfoils, LLC*, 448 F.3d 899, 908 (6th Cir. 2006). First, the trial court must determine whether the affidavit directly contradicts prior deposition testimony. "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.* "If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

The Court finds that portions of M.H.'s affidavit directly contradict previously sworn deposition testimony. But the Sixth Circuit has cautioned that the district court must use "a scalpel, not a butcher knife, . . . striking [only] portions of affidavits that do not satisfy the

17

requirements of [Rule 56(c)(4)]." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir. 2009) (holding that a district court abused its discretion by striking an entire affidavit, rather than striking only the inadmissible portions). Accordingly, as discussed in more detail below, the Court will consider only those portions of the affidavit that are not directly contradictory and do not, otherwise, constitute a sham affidavit.

Finally, the two cases were consolidated for purposes of pretrial management. While the parties have separately filed for summary judgment in each case, given the fact that the two cases rely—to a point—on the same core of nuclear facts, it is not surprising that many of the arguments for and/or against summary judgment of various claims are the same in each case. Accordingly, where appropriate, the Court will discuss the arguments together.

## III. DISCUSSION

### A.    § 1983—Substantive Due Process Claims

Under 42 U.S.C. § 1983, plaintiffs assert that the student-plaintiffs' substantive due process rights were violated. Plaintiffs allege claims against the individual defendants under theories of "special relationship" and "state-created danger,"[16] against James under supervisory liability, and against the District and the Board under municipal liability.

To establish a cause of action under 42 U.S.C. § 1983, a plaintiff must show: (1) a deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 463 (6th Cir. 2006). Defendants argue that neither set of plaintiffs can establish either element.

---

[16] Plaintiffs also rely on a theory of "apparent authority" to bind defendants. As explained below, such a theory cannot be maintained under § 1983.

As to the latter element, defendants insist that Hendon was a private actor. (*See, e.g.*, Case No. 5:18-cv-870, Doc. No. 102-3 at 2098.) They underscore the fact that plaintiffs admit in their respective complaints that Hendon was not employed by the District or the APD. (The M.J. Case, Doc. No. 1 ¶41; the W.H. Case, Doc. No. 31 ¶ 43.) The Due Process Clause does not generally impose an affirmative duty on the state to protect its citizens from the violence of third parties. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs*., 489 U.S. 189, 196, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989).

Plaintiffs argue, however, that defendants are bound by Hendon's actions based upon apparent authority or "agency by estoppel." (*See, e.g.*, the W.H. Case, Doc. No. 112 at 3922.) Relying entirely on Ohio law, plaintiffs maintain that defendants held Hendon out as an agent of the District and, therefore, gave plaintiffs the impression that Hendon had authority to engage in the conduct that underlies these actions. According to plaintiffs, the creation of apparent authority converted Hendon's private actions into state actions. (*Id*. (citing Ohio law).)

But plaintiffs have failed to come forward with any authority that would support the rather novel argument that state law agency principles apply to a consideration of the elements under § 1983, and the Court is unaware of any. *Cf. McCune v. City of Grand Rapids*, 842 F.2d 903, 905 (6th Cir. 1988) ("'[A]lthough state law may be considered to the extent it is not inconsistent with federal law, federal law controls for the purpose of characterizing section 1983 claims.'") (quoting *McMaster v. Cabinet for Human Resources*, 824 F.2d 518, 520 (6th Cir. 1987)). Rather, for a private actor's acts to be considered state action, "its actions [must] so approximate state action that they may be fairly attributed to the state." *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000).

19

The Sixth Circuit uses three tests to determine if a private actor's conduct amounts to state action. These are commonly referred to as: (1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test. *Id.*; *Boykin v. Van Buren Twp.*, 479 F.3d 444, 451 (6th Cir. 2007) (quotation marks and citation omitted). Plaintiffs have not even argued, let alone established, that Hendon meets any of the three tests.

Under the public function test, "a private party is deemed a state actor if he or she exercised powers traditionally exclusively reserved to the state." *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003). This test has been interpreted narrowly and only applied in "rare circumstances," such as the holding of elections and the exercise of eminent domain. *Brown ex rel. Thomas v. Fletcher*, 624 F. Supp. 2d 593, 599 (E.D. Ky. 2008) (collecting cases). "The Sixth Circuit has . . . made clear that the burden is on the plaintiff" to show through historical evidence that the activity has been traditionally exclusively reserved to the state. *Id.* at 600 (citing, among authority, *Straub v. Kilgore*, 100 F. App'x 379, 385 (6th Cir. 2004)). Under these directives, and in the absence of any evidence from plaintiffs, the Court cannot find that the operation of an unauthorized scared straight program constitutes state activity.

The state compulsion test "requires that the state 'exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state.'" *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007) (quoting *Wolotsky v. Huhn*, 960 F.3d 1331, 1335 (6th Cir. 1992)). There is no evidence in the record, and plaintiffs have failed to identify any, that would suggest that Hendon was coerced or prompted by a state actor into committing any of the alleged acts. Vincente provided unrebutted testimony that Hendon was not authorized to run a scared straight program

at Leggett, and she told him as much. (Vincente Dep. at 142.) While plaintiffs have pointed to evidence that they believe demonstrates that defendants tacitly approved or acquiesced in Hendon's actions, more is required to meet this second test. *Wolotsky*, 960 F.3d at 1335 ("More than mere approval or acquiescence in the initiatives of the private party is necessary to hold the state responsible for those initiatives."); *see also Blum v. Yaretsky*, 457 U.S. 991, 1004-08, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982) (private hospital's decision to transfer Medicaid patient to a lower level of care did not constitute state action, even though it was determined largely by following state regulations).

At best, the evidence demonstrates that Hendon sought out opportunities to insert himself into disciplinary matters involving the students at Leggett—such as when he took the phone from Morrison to speak with M.H., or when he appeared in Ramon's class when she called administration. There is nothing in the record to support a finding that any school official directed or coerced him into taking these actions. Evidence that school officials did not stop Hendon from acting simply does not equate with encouragement so significant that it rises to the level of state compulsion. *See, e.g., S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553, 565 (6th Cir. 2007) (evidence that park rangers watched while private company destroyed unflattering film footage of the rangers killing deer did not constitute state action).[17]

---

[17] In *S.H.A.R.K.*, after Metro Parks contracted with a private company to assist with planned deer-culling in the parks, a non-profit organization installed cameras in the park to capture footage of the rangers killing deer so that it could give the tapes to the local news stations. When the rangers discovered the cameras, they asked the head of the private company if he knew how to erase the tapes. The rangers then watched while the head of the private company destroyed the tapes. The Sixth Circuit found that the private actor "made a free-will choice" to erase the images, and, to the extent the rangers encouraged his efforts, held "this is not the type of significant encouragement which would turn [the private actor's] choice to delete the tapes into that of government action." *Id*. Similarly, here, Hendon made a "free-will choice" to engage with the students at Leggett.

Under the symbiotic relationship, or nexus, test, "the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the [private actor] so that the action of the latter may be fairly treated as that of the state itself." *Wolotsky*, 960 F.2d at 1335. The plaintiff must demonstrate that "the state is intimately involved in the challenged private conduct in order for that conduct to be attributed to the state." *Id.* (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974)); *see Brown*, 624 F. Supp. 2d at 602 (noting that "the required nexus must be found between the specific complained-of actions of the private actor and the involvement or influence of the State").

There is no evidence that the state had any influence or role in the specific challenged actions themselves—the alleged abuse of M.J. and W.H. *See, e.g., Brown*, 624 F. Supp. 2d at 603 (rejecting application of symbiotic test where state had no influence over the alleged acts of abuse or Medicaid fraud by private actor). "For the nexus test to be satisfied, the purported nexus must exist between the acts and the state, not simply between the defendant and the state." *Id.* While the challenged actions would never have taken place if schools officials did not permit Hendon inside Leggett, there are no allegations that school employees ever influenced the specific alleged acts of abuse involving M.J. and W.H. Likewise, there is nothing in the record to suggest Hendon was permitted access to the school for the purpose of running an unauthorized scared straight program or to inflict unlawful corporal punishment upon the students. Finally, neither the Board, nor its employees, benefitted in any way from any of Hendon's actions. The absence of the requisite state (District) involvement with Hendon's private conduct precludes the existence of a symbiotic relationship. *Compare Burton v. Wilmington Parking Auth.*, 365 U.S.

715, 724, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961) (finding state nexus test met, in part, based on the fact that the city benefited from the lease of space in parking garage to restaurant accused of denying access to African-American customer); *with Adams v. Vandemark*, 855 F.2d 312, 317 (6th Cir. 1988) (refusing to find the existence of a symbiotic relationship between city and non-profit hired to manage city housing program, where there were no allegations that the city benefitted from the challenged act of non-profit's discharge of its own employees). Accordingly, this third test is not satisfied.

### 1.     Liability for Hendon's Action

Even though Hendon cannot be considered a state actor, plaintiffs can still maintain claims under § 1983 if they can establish the existence of a "special relationship" or a "state-created danger." In *DeShaney*, the Supreme Court refused to impose municipal liability for parental abuse of a child sustained after officials failed to remove the child from his father's custody. But the *DeShaney* Court implicitly recognized, and courts, including the Sixth Circuit, have endorsed two exceptions whereby state actors have an affirmative duty of protection: "where they have a 'special relationship' with an individual, or where their conduct toward the individual resulted in a 'state-created danger.'" *Brooks v. Knapp*, 221 F. App'x 402, 406 (6th Cir. 2007) (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1988)).

### a.     Special Relationship

It is well settled that forced or involuntary custody is necessary to establish a special relationship with the state. *Doe v. Claiborne Cty.*, 103 F.3d 495, 510 (6th Cir. 1996); *see Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005). Moreover, compulsory school attendance alone does not create a special relationship between school districts and their students. *Soper v. Hoben*,

23

195 F.3d 845, 853 (6th Cir. 1999). Relying on agency principles, plaintiffs argue that the state—through its "agent" Hendon—restrained the student-plaintiffs by either handcuffing them or confining them in closed rooms. (*See* Case No. 5:18-cv-577, Doc. No. 93 at 3986; Case No. 5:18-cv-870, Doc. No. 112 at 3922.) As discussed previously, plaintiffs cannot rely on state agency principles to satisfy the statutory requirements under § 1983, and plaintiffs have not demonstrated that the state restrained the student-plaintiffs. *See Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995) ("A special relationship can only arise when the *state* restrains an individual.") (emphasis in original). Since there is no evidence that the state directed the handcuffing or confinement of the student-plaintiffs, the record simply does not support a finding that there was a special relationship between defendants and student-plaintiffs.[18]

b.    <u>State-Created Danger</u>

"Liability under the state-created danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Kallstrom*, 136 F.3d at 1066. In *Kallstrom*, the Sixth Circuit recognized three elements a plaintiff must satisfy to establish liability under the state-created danger exception: (1) an affirmative act that creates or increases the risk, (2) a special danger to the victim as distinguished from the public at large, and (3) the requisite degree of state culpability. *Id.*; *see McQueen*, 433 F.3d at 464; *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). "This is a particularly demanding standard requiring that the state's affirmative action exposed

---

[18] Specifically, Vincente testified that she believed that the parents had arranged for the handcuffing with Hendon. (*See* Vincente Dep. at 221.)

the plaintiff to a danger [he] wasn't already subjected to." *Vidovic v. Mentor City Sch. Dist.*, 921 F. Supp. 2d 775, 792 (N.D. Ohio 2013) (citing *Sargi*, 70 F.3d at 910–11).

"In determining whether an affirmative state act increased the risk of harm to an individual, the question is whether the individual 'was safer *before* the state action than . . . *after* it." *Janiski v. Tyler*, 729 F.3d 531, 539 (6th Cir. 2013) (emphasis in original) (quoting *Cartwright*, 336 F.3d at 493). Defendants argue that the individual defendants took no affirmative acts and, at best, they were only guilty of a failure to act by failing to stop Hendon from abusing the student-plaintiffs. (*See, e.g.*, Case No. 5:18-cv-577, Doc. No. 99-3 at 5416.) It is true that a "failure to act is not an affirmative act under the state-created danger theory." *Cartwright*, 336 F.3d at 493; *see DeShaney*, 489 U.S. at 197; *Jones v. Reynolds*, 438 F.3d 685, 691 (6th Cir. 2006) (failure to stop a drag race was not an affirmative act); *see, e.g., McQueen*, 433 F.3d at 466–67 (a teacher who momentarily left students unsupervised did not take an "affirmative act" subjecting the students to violence by another student who had secretly brought a gun to school); *see also Vidovic*, 921 F. Supp. 2d at 792 (collecting cases where schools were not liable for failing to stop tortious conduct by third parties).

According to plaintiffs, "[o]ne could argue that [defendants] took limited action in preventing Hendon from snatching children from their classrooms, handcuffing them, assaulting them, yelling and screaming at them, and ultimately making them cry—like what he did do." (*See, e.g.*, the M.J. Case, Doc. No. 93 at 3989.) Regardless of how plaintiffs cast these types of actions, they still constitute a failure to act that cannot support state liability under the state-

created danger theory.[19] *See Stiles ex rel. D.S. Grainger Cty., Tenn*., 819 F.3d 834, 854 (6th Cir. 2016) (failure to enforce school policy and not discipline students for violent actions did not qualify as affirmative acts that created or increased the risk of danger to student plaintiff).

Plaintiffs also argue that the individual defendants did take affirmative acts by permitting Hendon "unfettered access to the students at Leggett." (The M.J. Case, Doc. No. 93 at 3989; the W.H. Case, Doc. No. 112 at 3924.) This argument hits closer to the mark. Hendon's ruse depended upon his ability to generate opportunities where he could be alone with the students. It also, to some extent, required the opportunity to market the fake scared straight program directly to the students' parents. In both situations, the school and its staff stood as a barrier between Hendon and his intended victims. It is, therefore, necessary to examine the affirmative actions taken by defendants to determine if they substantially increased the risk of harm to the student-plaintiffs.

Assuming the existence of qualifying affirmative acts, the Court must then evaluate the evidence in each case (and as to each defendant) in light of the third prong of the state-created danger test—the "requisite culpability to establish a substantive due process violation under the Fourteenth Amendment." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). Only conduct that "shocks the conscience" will be sufficient to establish the requisite culpability. *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ*., 542 F.3d 529, 535 (6th Cir. 2008). In situations where

---

[19] Likewise, plaintiffs' allegations that defendants "allowed" Hendon to take certain action falls short of establishing the existence of affirmative acts. For example, in the M.J. Case, plaintiffs argue that "Vincente *allowed* Hendon and James to call parents . . . to discuss the illegal program, *allowed* Hendon to sit in [Vincente's] office to assist with discipline, *allowed* teachers to call Hendon to the school, and *permitted* Hendon to take children out of the school in handcuffs[.]" (Doc. No. 93 at 3989, emphasis added.) There is no evidence that Vincente encouraged, directed, or even suggested that Hendon take these actions; Hendon took them on his own initiative. Again, failing to stop someone from certain behavior is not an affirmative act. *See Stiles*, 819 F.3d at 854.

there is opportunity for reflection, the guiding principle is "deliberate indifference," which the Sixth Circuit has equated with "subjective recklessness[.]" *McQueen*, 433 F.3d at 469 ("Although public schools are busy places, [the teacher] did not need to make a split-second decision that merits applying a higher standard."); *see Wilson v. Columbus Bd. of Educ.*, 589 F. Supp. 2d 952, 962–63 (S.D. Ohio 2008).

The Sixth Circuit has explained that there is no "calibrated yard stick" for evaluating whether state action meets this standard. *Caldwell v. City of Louisville*, 120 F. App'x 566, 574 (6th Cir. 2004). At one end of the spectrum "the standard requires a showing beyond mere negligence." *Id.* (quoting *Ewolski*, 287 F.3d at 510). "At the other end of the spectrum, it is generally agreed that Fourteenth Amendment liability will attach to conduct intended to injure in some way unjustifiable by any government interest." *Id.* (quoting *Ewolski*, *supra*). At times, however, the official's conduct will lie somewhere in between. *Id.* It is this middle ground, where the present cases fall, that demand rigorous analysis of the facts in each case. *See id.*

To aid navigation through these murky waters, the Sixth Circuit recently expounded on the deliberate indifference standard, explaining that it contains two separate components. *See Doe v. Jackson Local Sch. Dist.*, 954 F.3d 925, 933 (6th Cir. 2020). First, "[a]n official must 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Ewolski*, 287 F.3d at 513) (further citation omitted). Second, "'[h]aving drawn the inference,' the official must 'act or fail to act in a manner demonstrating 'reckless or callous indifference toward the individual's rights.'" *Id.* The first part is satisfied when the official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *Ewolski*, 287 F.3d at 513 (citation omitted), a public

27

official must know of more than *general* risk of harm. The official must know of the *specific* risk that later develops." *Id.* at 933-34 (emphasis in the original). "To act with 'reckless or callous indifference [under the second prong],' *Ewolski*, 287 F.3d at 513 (citation omitted), a public official must do more than be aware of 'a substantial risk of serious harm,' *Hunt*, 542 F.3d at 543. The official's response to that harm must also be 'conscious shocking.'"[20] *Id.* at 934 (quoting *Schroder v. City of Fort Thomas*, 412 F.3d 724, 731 (6th Cir. 2005)).

### i.      The M.J. Case

There are several actions taken by staff and teachers in this case that would qualify as affirmative acts. For example, an office secretary gave Hendon confidential student information, including the report cards of M.J. and other students. Additionally, a special education teacher affirmatively sought out Hendon and reported to him that M.J. and two other students were misbehaving on the playground. As for Vincente, she offered up a conference room to Hendon upon his request--a room he allegedly used to abuse M.J. Vincente also called S.J. to report that she had requested that Hendon have a "stern" talk with M.J. about his bad behavior.[21]

---

[20] In *Doe v. Jackson, supra*, the parents of a kindergarten student who was sexually assaulted on a school bus by an older student brought a federal civil rights action against the school and its employees on a state-created danger theory. Their substantive due process claim was premised on the fact that school officials had reassigned the older student a seat on the bus in close proximity to the kindergartner, who sat in the front of the bus, after the older student had been caught in the back of the bus with lit matches. The Court found that the parents failed to create a genuine dispute of material fact as to either prong of the deliberate indifference standard. As to the first prong, the Sixth Circuit found that there was nothing about the older student's prior behavior—lighting matches and bullying students into not reporting his behavior—that would have put school officials on notice of the specific risk of harm that resulted—the sexual assault of a fellow student. The second part of the test was also unsatisfied because the school officials' actions were not callous, as they were responding appropriately to the known threat, though the consequences from an unforeseen threat were tragically heartbreaking.

[21] Plaintiffs have failed to identify any qualifying acts taken by Ramon. It is true that she called "administration" to report M.J.'s misconduct, but she merely failed to step in to prevent Hendon, who she believed was a police officer, from leaving the classroom with M.J. Such omissions cannot support liability under state-created danger theory. For this reason, she is entitled to summary judgment on plaintiffs' substantive due process claim.

Each of these actions had the effect of facilitating Hendon's scheme. Vincente's offer of a secluded conference room with no windows assured that Hendon's alleged abuse of M.J. would go unnoticed by staff. Vincente's request that Hendon have a stern talk with M.J. and the special education teacher's report to Hendon both afforded Hendon additional opportunities to interact with M.J. in an inappropriate manner.[22] Viewing this evidence in the light most favorable to plaintiffs, the Court concludes that the risk that M.J. would be abused at the hands of Hendon, was greater *after* the above-identified actions.

But that does not end the inquiry. The Court must also determine whether the acts were committed with the requisite degree of culpability. School staff, including Vincente, testified that they believed that Hendon was a police officer, and that they acted as they did because of this belief. (*See* Vincente Dep. at 111, 115, 125–27, 142, 178, 206; Ramon Dep. at 13, 62, 84; DeLisi Dep. at 76; Derita Dep. at 40, 44-45.) Even S.J. testified that she was convinced that Hendon was a member of law enforcement. (S.J. Dep. at 118–19, 125–27.) It is also undisputed that no school staff member witnessed Hendon's alleged abuse of M.J. that occurred on school grounds. These facts alone would not be sufficient to establish the requisite degree of culpability.

But the record also establishes that, unlike the other school staff, Vincente was aware of other facts relative to Hendon. Thus, the Court must determine whether Vincente was aware of facts from which the inference could have been drawn that a substantial risk of serious harm

---

[22] To the extent that Vincente can be held responsible for the affirmative acts of her subordinates, it could be argued that the act of providing the students' report cards also had the effect of furthering Hendon's scheme. While defendants note that it was M.J. who supplied Hendon with his mother's contact information, the fact that Hendon was able to produce M.J.'s report card during his meeting with M.J.'s mother at the YMCA reinforced Hendon's position that he was a representative of the District acting on its behalf.

29

existed as to M.J. at the time she acted, and that she drew that inference, but acted in any event in a manner that was conscience shocking.

The Court begins with the first part of the deliberate indifference standard. Vincente was aware that scared straight programs were not sanctioned by APS, and she knew that Hendon was intent on bringing such a program to APS, as he repeatedly discussed it with her. (Vincente Dep. at 143 [Hendon "was big on his program."]; *see id*. at 141, 162.) Despite telling Hendon he would not be permitted to run such a program at Leggett, during his second visit to the school on April 7, 2017, Vincente had to intervene and stop Hendon from requiring a class of third grade students to walk out at dismissal with their hands over their heads. (*Id*. at 165.) Similarly, despite being aware that handcuffing children could constitute corporal punishment (*see id*. at 38–39), Vincente concedes that she saw several children in Hendon's presence at Leggett in handcuffs. (*Id*. at 170–72.) According to Vincente, she did not intervene because she assumed that since the parents were present that they had arranged with Hendon, a man she believed to be a police officer, to have their children handcuffed. (*Id*. at 172–73, 174, 211, 221.) While she admitted that she had never seen children handcuffed in her school before (*see id*. at 176), she also testified that she believed that police officers were "under different parameters than teachers," though she admitted that police officers are not authorized to participate in school discipline. (*Id*. at 83, 173, 179.)

If, at the time Vincente acted with respect to M.J., Vincente was aware that Hendon was attempting to conduct activity consistent with an unauthorized scared straight program and was handcuffing children at school, a reasonable jury could conclude that Vincente was aware of facts that would support the inference that a substantial risk of serious physical harm existed as

to M.J., the *specific* harm that ultimately came to pass. The record is entirely unclear as to the timeline of when Vincente learned these facts in relation to her alleged decision to give Hendon a private room and to suggest that Hendon have a "stern talk" with M.J. (*Id.* at 171, 177 ["The days kind of ran together. I know it wasn't the first day [that she saw children in handcuffs]."].) As such, there remains a question of fact as to whether Vincente was aware of facts from which the inference could be drawn that a substantial risk of serious physical harm to M.J. existed at the time she acted and whether she drew that inference. Questions of fact, therefore, surround the first part of the deliberate indifference standard.

These same factual disputes preclude a determination as to whether the second part of the standard can be satisfied. If Vincente was aware that Hendon posed a specific physical threat to students, like M.J., who were misbehaving in her school when she afforded Hendon opportunities to be alone with M.J., then it could be argued that she callously disregarded the specific risk to M.J.[23] These unanswered questions on deliberate indifference preclude dismissal of the substantive due process claim as against Vincente.[24]

### ii.    The W.H. Case

Far fewer qualifying affirmative acts can be found in the record of the W.H. Case, and they are limited to one particular actor—defendant Morrison. As set forth above, it was Morrison

---

[23] Vincente relied on the presence of the parents to support her belief that it was acceptable for Hendon to handcuff the children at school, though there is nothing in the record to suggest that M.J.'s mother, S.J., was present when Hendon asked Vincente for a private room for him and M.J. Vincente also testified, however, that she was aware that S.J. had given Hendon permission to work with M.J. at school. These are all circumstances a jury would have to consider in determining whether Vincente's affirmative acts were done with deliberate indifference.

[24] There is no evidence that Ramon participated in any qualifying affirmative acts or that she possessed knowledge of any facts that would have given rise to the inference that contact with Hendon would put M.J. at substantial risk of harm. It is undisputed that she believed that Hendon was an officer, that she did not witness any children in handcuffs, and that she was unaware of any inappropriate interaction between Hendon and M.J. Moreover, there is no evidence that she callously disregarded a risk when she allowed a man who she believed to be a police officer to take M.J. She is, therefore, entitled to summary judgment on this claim for this additional reason.

31

who initially placed the call to M.H. to report W.H's bad behavior and then, upon Hendon's request, permitted Hendon to take the phone and speak in private with M.H. Once again, the student was certainly safer *before* the state actor put Hendon in direct contact with the student and his mother.

But unlike Vincente's affirmative acts in the M.J. Case, there is no evidence to support a finding that Morrison was aware of any facts from which an inference of substantial risk of serious harm to M.J. could be made, or that she responded to any such risk callously. Morrison testified that she handed the phone to Hendon upon his request because she believed he was a police officer. (Morrison Dep. at 45.) It is undisputed that she did not hear the subsequent conversation between Hendon and W.H. It is also undisputed that Morrison never witnessed any children in handcuffs at Leggett before Hendon placed W.H. in restraints with his mother, M.H., present.[25] While she did not intervene to stop Hendon from handcuffing W.H. in his mother's presence, such an omission would not qualify as an affirmative act. Based on this record, the Court finds, as a matter of law, that Morrison did not act with the knowledge of facts that would give rise to an inference of a substantial risk of serious harm to W.H., or that she acted in response to any known risk in a manner that shocked the conscience. There was, therefore, no constitutional violation. Summary judgment in favor of all defendants on this claim is appropriate.

---

[25] Prior to the encounter with W.H., Morrison had spoken briefly with Hendon at which time Hendon told her he was with a scared straight program operated through the APD. At that time, he showed her pictures allegedly taken from his program wherein some children were handcuffed, away from school property, near a juvenile justice building. (Morrison Dep. at 22, 37-39.) Morrison also passed Hendon in the halls with her class and, on that occasion, Hendon encouraged Morrison's students to be good and get good grades. (*Id*. at 23-24, 31.)

       2.      *Municipal Liability Claim against the Board and District*

In the absence of an underlying substantive due process violation in the W.H. Case, the Court need not consider whether there is municipal liability for that claim. *See McQueen*, 433 F.3d at 471 (noting that a municipality can only be liable upon a showing of liability on the part of its officials).

In the M.J. Case, plaintiffs argue that the Board and the District are liable under a theory of municipal liability, alleging that a widespread practice or custom caused the constitutional violation and that the constitutional injury was caused by a person with final policymaking authority. *See Ruble v. Escola*, 898 F. Supp. 2d 956, 976 (N.D. Ohio 2012) (collecting supreme courts cases identifying three bases for municipal liability under § 1983: (1) when an express policy causes a constitutional violation, (2) when a widespread practice or custom is so common that it has the effect of a written policy that causes the violation, and (3) when the constitutional injury is caused by a person with final policymaking authority).

A school board or district may not be held liable under § 1983 on a theory of *respondeat superior*. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *McQueen*, 433 F.3d at 470. Rather, a government entity is only responsible when its policy or custom was the "moving force" behind the asserted harm, or if the entity's "failure to train employees amounts to deliberate indifference to constitutional rights." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1977); *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994 (6th Cir. 2017); *see Doe v. Claiborne Cty. ex rel. Clairborne Cty. Bd of Educ.*, 103 F.3d 495, 505–06 (6th Cir. 1996). For a failure to train claim, the plaintiff must prove that the "training program is inadequate to the

tasks the [state officials] must perform; that the inadequacy is the result of the [municipality's] deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Hill v. McIntyre,* 884 F.2d 271, 275 (6th Cir. 1989) (citing and quoting *City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989)).

> a.  Failure to Train

Under a failure to train claim, the failure to train must amount to deliberate indifference to the legal rights of persons with whom the employees come into contact. *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011); *see Miller v. Calhoun Cty*., 408 F.3d 803, 815 (6th Cir. 2005). "Evidence of a pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *H.M. v. Bd. of Educ. of the Kings Local Sch. Dist*., 117 F. Supp. 3d 992 (S.D. Ohio 2015) (citing *Connick*, 131 S. Ct. at 1359–60). "Without notice that training is deficient in a particular respect, the decision-makers cannot be found to have deliberately chosen a training program that will cause violations of constitutional rights." *Id*. (quoting *Connick, surpa*).

Plaintiffs allege that the Board and the District had an unwritten policy of inadequate training. Specifically, plaintiffs note that APS employees were never trained on identifying imposter police officers attempting to gain access to school buildings. (The M.J. Case, Doc. No. 92 at 2727-28, citing James Dep. at 20 [Spotting fake police officers "never was on [APS's] radar."]; Rambler Dep. at 15; Vincente Dep. at 55.) But the evidence does not show that defendants' employees had a history of admitting imposter police officers into APS buildings, or that any such imposters ever inflicted harm upon APS students. "So far as the record reveals, this was a one-time incident, and there is no evidence of a pattern of constitutional violations making

it 'obvious' that additional training or safeguards were necessary." *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 392 (8th Cir. 2007) (citing *City of Canton*, 489 U.S. at 390 & n.10). "Mere allegations that an [official] was improperly trained or that any injury could have been avoided with better training are insufficient to prove liability." *Miller*, 408 F.3d at 816 (rejecting failure to train claim where there was "no history of similar incidents . . . , nothing to show that the County was on notice, and nothing to show that the County's failure to take meliorative action was deliberate").

Plaintiffs also allege that the Board and the District had a policy of inadequately training employees on the distribution of confidential student information. But the secretaries were clear that they did receiving training in confidential records. (Derita Dep. at 41–44.) The only confusion was with respect to whether student information should be given to a uniformed police officer when specifically instructed to do so, a situation that had never come up before.[26] (*Id*. at 46-47.) Once again, plaintiffs offer "no evidence beyond the facts of this case tending to show that the [municipal entity's] training . . . policies were inadequate." *Miller*, 408 F.3d at 816.

Plaintiffs cannot hang municipal liability on a failure to train.[27]

---

[26] James testified that the distribution of student records to law enforcement would not necessarily violate the District's policy, which provides that "Students records shall be available only to students and their parents, eligible students, designated school officials who have a legitimate educational interest in the information, *or to other individuals or organizations as permitted by law*." (James Dep. at 110, citing Policy at James Dep. Ex. I, emphasis added.)

[27] Additionally, plaintiffs have offered no evidence, by way of expert testimony or policies employed in other school districts, as to what training a school district should provide to support this claim. *See A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 585 (3rd Cir. 2004) (noting that plaintiffs' failure to train claim was supported by unrebutted expert testimony that the training in place was inadequate).

b.      Officials as Final Policymakers

Plaintiffs also maintain that both James and Vincente are final policymakers. "Under appropriate circumstances, even a single act or decision may qualify as an official government policy, though it be unprecedented and unrepeated." *Holloway v. Brush*, 220 F.3d 767, 773 (6th Cir. 2000). Such a single act or decision "will only be construed as official policy when they are those of a body or an official 'responsible for establishing final government policy respecting such activity . . . .'" *Id*. (quoting *Pembaur*, 475 U.S. at 483). "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). Authority to make final policy comes from customs, statutes, or delegation by other officials who have final policymaking authority. *Id*. (citing *Pembaur, supra*).

Plaintiffs argue that James, as superintendent, is a final policymaker because he has the authority to hire, fire, and discipline personnel, and to work with the Board on the policies they enact. (Doc. No. 92 at 2735, citing James Dep. at 5-7.) They suggest that Vincente, as principal, is a final policymaker because she had the authority to institute programs in her school without prior Board approval. (*Id*.)  According to plaintiffs, "[i]t is *plausible* that the Superintendent and Principal are delegated final policymaking authority or that there is a custom of allowing the Superintendent and Principal to make final policy decisions with respect to the day-to-day conduct of employees, day-to-day operations of the school, the necessity of reporting potential abuses to authorities, and the appropriateness of informing (or not informing) parents of special needs children of abuse." (*Id*., emphasis added.)

36

In support of their position, plaintiffs cite *H.M., supra*, a case decided on a motion to dismiss. Unlike on a motion to dismiss, however, it is not sufficient on summary judgment to argue the plausibility of one's claims. Rather, to maintain a claim at this stage in the litigation, plaintiffs were required to come forward with evidence of specific facts showing a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. In this instance, plaintiffs were required to point to statutory authority showing that the official does in fact have the requisite authority, or to evidence that such statutory authority had been delegated to the official. *See Praprotnik*, 485 U.S. at 112. Plaintiffs have failed to come forward with evidence on either front.[28]

The fact that James had the authority to work with the Board to establish policies does not mean that he had the authority to "make *final* policy." *Praprotnik*, 485 U.S. at 127 (emphasis in original) (citing *Pembaur*, 475 U.S. at 481–84). "When an official's discretionary decisions are constrained by policies not of the official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct with *their* policies." *Id*. (emphasis in original). James testified that through various departments he assures that the policies and procedures *of the Board* are followed and has the authority to discipline if a Board policy is not followed. (James Dep. at 8.)

---

[28] Plaintiffs posit that the Board and James "essentially abdicate[d] any duty they may have had to set policies governing the operation of the school and to provide training for the teachers and administrators who were charged with supervising the school and making sure the children remained safe and felt secure." (Doc. No. 92 at 2736.) Again, the Court has already determined that the record does not support a finding of a policy—whether promulgated by the Board or James—of a failure to train. They also fail to even identify what policies should have been proactively set to anticipate and protect against this unprecedented occurrence.

According to plaintiffs, Vincente is also a final policymaker. They underscore the fact that, under District policies and procedure, a program can be instituted at the school level without the need for Board approval. (Doc. No. 92 at 2735, citing record.) But it was Hendon, and not Vincente, who attempted to conduct a rogue scared straight program at Leggett. Rather than set policy by establishing such a program, Vincente told Hendon that a scared straight program would not be authorized. Moreover, Vincente's authority to exercise her discretion in the day-to-day operations of the school cannot be equated with policymaking. *See Miller*, 408 F.3d at 814 (noting that civil rights plaintiff had conflated shift commander's decision-making authority in response to emergency care for inmates with policymaking that could have bound the county).

      c.    <u>Ratification</u>

Additionally, without identifying any specific defendant, plaintiffs suggest that "defendants" ratified their employees' actions through an inadequate investigation that did not result in the discipline of even "*one* employee." (Doc. No. 92 at 2731, emphasis in original.) It is true that an official may ratify employees' actions by failing to meaningfully investigate those actions and take appropriate corrective measures. *Wright v. City of Canton*, 138 F. Supp. 2d 955, 966 (N.D. Ohio 2001). In *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241 (6th Cir. 1989), for example, the plaintiff, a paraplegic who was awaiting sentencing at the county jail, alleged deliberate indifference to his medical needs. The Court found that the sheriff knew or should have known of the plaintiff's deplorable treatment by the sheriff's subordinates, particularly given the fact that fourteen other paraplegics previously had been mistreated in the same manner. The sheriff took no action to correct the problem and did not discipline the responsible

employees. Under these circumstances, the Court found that the sheriff ratified his employees' misconduct. *Leach*, 891 F.2d at 1248.

In contrast to *Leach*, James testified that, following Hendon's arrest, General Counsel for the Board was tasked with performing a full investigation into the incident, an incident of first impression in the district involving the actions of a non-employee impersonating a police officer. (James Dep. at 13–16.) The mere fact that no District employee was disciplined or re-trained at the conclusion of the investigation does not establish that the municipality ratified the underlying conduct. *See German v. Roberts*, No. C15-5237 BHS-DWC, 2017 WL 6547472, at *2 (W.D. Wash. Dec. 22, 2017) ("The mere fact that an officer was not reprimanded or provided with additional training cannot support a theory of ratification" under *Monell*); *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1190 (D. Haw. 2003) ("Something more than the failure to reprimand is needed to survive a motion for summary judgment" as to municipal liability under § 1983.); *see also Maynard v. Jackson Cty.*, 706 F. Supp. 2d 817, 827–28 (S.D. Ohio 2010) (holding that sheriff's failure to discipline an officer on a single occasion could not be the "moving force" behind the constitutional violation).

Plaintiffs also appear to suggest that Vincente ratified Hendon's unauthorized program. Ratification, however, requires more than the acquiescence in the discretionary decisions of others, and Vincente's failure to stop Hendon from conducting a program she told him he was not permitted to conduct cannot constitute ratification. *Feliciano*, 988 F.2d at 656 (noting that the ratification, itself, must be a moving force behind the constitutional violations); *Cf. Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1291–94 (11th Cir. 2004) (*principal's decision* to

permit paddling of a high school student in lieu of detention that would have delayed student's graduation was made by a policymaker because it was unreviewable by the board).

        d.    <u>Supervisory Claim</u>

Finally, plaintiffs bring a supervisory claim against James. "The law is clear that liability of supervisory personnel must be based on more than merely the right to control employees[.]" *Leach*, 891 F.2d at 1246 (quotation marks and citation omitted). "Further, a claim of failure to supervise or properly train under section 1983 cannot be based on simple negligence." *Id*. "'[A] failure of a supervisory official to supervise, control, or train the offending individual [employees] is not actionable absent a showing that the official either encouraged or in some way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending [employees].'" *Id*. (quoting *Hays v. Jefferson*, 668 F.2d 869, 872 (6th Cir. 1982)). "To prove a failure-to-supervise claim, a plaintiff must meet the same standards required to prove a failure-to-train claim, that is, a municipality's deliberate indifference to the risk of the constitutional violation and that its deliberate indifference was the moving force behind the [inflicted harm]." *H.M*., 117 F. Supp. 3d at 1010 (citing *Amerson v. Waterford Twp*., 562 F. App'x 484, 491–92 (6th Cir. 2014)).

There is no evidence that James encouraged or in some way directly participated in the activities surrounding Hendon's visits to Leggett. Plaintiffs have pointed to nothing in the record that would suggest that James was even aware of Hendon's activities until after his arrest. Moreover, while "[a] conclusion of deliberate indifference may result from a municipality's failure to act in response to repeated complaints of constitutional violations," *id.* (citing *Brown v.*

*Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)), there were no prior incidents of fake officers gaining entry to APS schools to harm children that would put James on notice of the potential for abuse. The record on summary judgment is simply too thin to support a failure to supervise claim.[29]

### B.  Equal Protection Claims

Plaintiffs in each case also allege an equal protection violation based on the student-plaintiffs' race—African-American—and based on a disability--a learning disability.[30] The Equal Protection Clause "prevents states from making distinctions that (1) burden fundamental rights; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Johnson v. Bredsen*, 624 F.3d 742, 746 (6th Cir. 2010). "To state a claim under the 'suspect class' section of the Equal Protection Clause, a plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Vidovic*, 921 F. Supp. 2d at 793-94. The Court has already determined that Hendon was not a state actor, and there is nothing in the record that would, in

---

[29] Because there is no evidence that James or the municipal defendants failed to adequately train, supervise, or discipline—or any evidence that any state actors otherwise acted with deliberate indifference—plaintiffs' claim of cruel and unusual punishment under the Ohio Constitution, brought in the W.H. Case, also fails. (*See* the W.H. Case, Doc. No. 31 ¶¶ 128-29.)

[30] Plaintiffs in the M.J. Case bring their equal protection claim under the Equal Protection Clause of the Fourteenth Amendment. (Doc. No. 1 at 18-19). Plaintiffs in the W.H. Case rely on the Ohio Constitution. (Doc. No. 31 at 263.) "[T]he federal and Ohio Equal Protection Clauses are to be construed and analyzed identically." *Ass'n of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 717 N.E.2d 286, 291 (Ohio 1999) (applying federal law to Ohio equal protection claim).

[31] "Disabled persons are not a suspect class for purposes of an equal protection challenge." *S.S. v. E. Kentucky Univ.*, 532 F.3d 445, 457 (6th Cir. 2008). Accordingly, "[a] state may . . . treat disabled students differently, so long as its actions are rationally related to some legitimate governmental purpose." *Id*. Defendants do not suggest that there was a legitimate governmental purpose attached to Hendon's actions.

any event, support a finding that Hendon intentionally discriminated on the basis of race or disability.

While there is no evidence of any white children harmed at the hands of Hendon, an African American male, there is nothing in the record that would support a finding that Hendon targeted any children because of their race.[32] There is also no evidence that Hendon selected his victims on the basis of disability. Rather, the evidence establishes only that Hendon, a private actor, targeted children with behavioral problems.[33] Plaintiffs argue that the student-plaintiffs misbehaved because of their disabilities, but there is nothing in the record that supports this assertion. Moreover, plaintiffs have pointed to no evidence from which a jury could find that Hendon was even aware of the student-plaintiffs' disabilities or their IEPs, let alone that Hendon was motivated by the fact that the students were on IEPs. *See Gohl v. Livonia Pub. Sch. Dist.*, 836 F.3d 672, 684 (6th Cir. 2016) (defendants prevailed on summary judgment as to equal protection claim because plaintiffs did not identify any evidence showing that abuse occurred *because* of child's disability).

Plaintiffs argue, however, that Vincente, Morrison, and others were deliberately indifferent to Hendon's discriminatory targeting of the student-plaintiffs. (*See, e.g.*, the W.H. Case, Doc. No. 111 at 2708–09.) *See Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612, 618

---

[32] For the same reasons, plaintiffs' Title VI claims fail. Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "The standard for proving a discrimination claim under Title VI is at least as stringent as that for proving an Equal Protection claim." *See Vidovic*, 921 F. Supp. 2d at 796 (summary judgment on Title VI claim appropriate where no evidence of affirmative act of discrimination by school or deliberate indifference to known severe, pervasive and objectively offensive discrimination by students). Because there is no evidence of race discrimination by *anyone*, or deliberate indifference to known discrimination, these claims must be dismissed.

[33] There is also no evidence that Hendon treated similarly situated white children who had exhibited disciplinary problems differently.

(6th Cir. 2012) ("[A] plaintiff may demonstrate defendant's deliberate indifference to discrimination only when the recipient's response to [discrimination] or lack thereof is clearly unreasonable in light of the known circumstances.") (quotation marks and citation omitted). Again, the record does not support a finding that anyone, state or private actor, discriminated against these students on the basis of race or disability. Even if there were such evidence, however, the equal protection claims would still fail because plaintiffs cannot show deliberate indifference by any state actors to any known discrimination.[34]

### C.  ADA/Rehabilitation Act Claims

For many of the same reasons the Equal Protection Claims fail to withstand summary judgment, plaintiffs' claims under the ADA and the RA also do not survive summary judgment. "Title II of the Americans with Disabilities Act provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected by discrimination by any such entity.'" *Gohl*, 836 F.3d at 681 (quoting 42 U.S.C. § 12132). "Section 504 of the Rehabilitation Act provides that a qualified individual with a disability shall not, 'solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal

---

[34] Plaintiffs also maintain that the individual defendants are liable under § 1983 for failure to intervene. Assuming that the pleadings can be construed to raise such claims, the Court finds that these claims cannot survive summary judgment. It is true that the Sixth Circuit has recognized that state actors "can be held liable for failure to protect a person from the use of excessive force." *Turner v. Scott*, 119 F. 3d 425, 429 (6th Cir. 1997). Such a cause of action has been extended only to circumstances involving police officers, security personnel, and a nurse in a prison who witnessed a severe beating, had the authority to stop it, and did nothing. *See e.g., Wright v. City of Canton*, 138 F. Supp. 2d 955, 964 (N.D. Ohio 2001); *Durham v. Nu'Man*, 97 F.3d 862, 866-68 (6th Cir. 1996); *McHenry v. Chadwick*, 896 F.2d 184, 188 (6th Cir. 1990); Case No. 5:18-cv-870, Doc. No. 112-32 (Affidavit of M.H. ["M.H. Aff."]). In the absence of any binding or persuasive authority involving teachers and administrators under circumstances similar to those presented herein, the Court declines to create such a cause of action.

financial assistance.'" *Id.* (quoting 29 U.S.C. 794(a)). Both the ADA and the RA, therefore, require that "the challenged discrimination . . . occur *because* of disability, which is another way of saying that the plaintiff must establish a but-for relationship between the protested act and the individual's disability." *Id.* at 682 (emphasis in original).

There is simply no evidence that student-plaintiffs were targeted because of their disabilities. Under these circumstances, plaintiffs cannot point to evidence that, if believed, would support a finding that student-plaintiffs were discriminated against because of (or in the case of the RA, solely because of) their disabilities. These claims are subject to dismissal.

### D.      Qualified Immunity

Because the Court has determined that there is a question of fact as to whether Vincente can be held responsible in the M.J. Case for violating substantive due process rights, the Court must consider whether she is entitled to qualified immunity.

The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). "Qualified immunity provides [officials] 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*, 571 U.S. 3, 6, 134 S. Ct. 3, 187 L. Ed. 2d 341 (2013) (per curiam)). Qualified immunity will apply "'if [officials] of reasonable competence could disagree on the issue.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092,

89 L. Ed. 2d 271 (1986)); *see Ewolski*, 287 F.3d at 501 (qualified immunity will apply unless it is obvious that no reasonably competent official would have concluded that the action was lawful).

Courts employ a two-part test to determine if qualified immunity applies. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an official's conduct violated a constitutional right. *Ewolski*, 287 F.3d at 501; *see Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Second, if a constitutional right was violated, courts must determine "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of Nashville & Davidson Cty.*, 486 F.3d 217, 219 (6th Cir. 2007) (quotation marks and citation omitted). If a plaintiff fails to establish either prong, he has failed to carry his burden, and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Since the failure of either prong is dispositive in favor of a defendant, the Court may address either prong first. *See Pearson*, 555 U.S. at 236.

The Supreme Court has recently reiterated earlier admonitions that "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, -- U.S. --, 137 S. Ct. 548, 552, 196 L. Ed. 2d 463 (2017) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *Anderson*, 563 U.S. at 639).

45

According to this directive, "a plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to [officials]' about what the law requires." *Arrington-Bey*, 858 F.3d at 993 (quoting *Pauly*, 137 S. Ct. at 552). Throughout the qualified immunity analysis, "[t]he 'dispositive inquiry . . . [remains] whether it would be clear to a reasonable [official] that his conduct was lawful in the situation he confronted.'" *Id.* (quoting *Saucier*, 533 U.S. at 202.

In determining whether a law is clearly established, this Court looks to decisions of the Supreme Court and the Sixth Circuit. *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007). If controlling authority does not establish the law, this Court may consider other circuit authority. *Andrews v. Hickman Cty.*, 700 F.3d 845, 853 (6th Cir. 2012). Although a prior case need not be directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. The clearly established prong will depend "substantially" on the level of generality at which the legal rule is identified. *Anderson,* 483 U.S. at 639. Again, the right must be clearly established in a particularized sense, and not in a general abstract sense. *Id.* at 640. "'This standard requires the courts to examine the asserted right at a relatively high level of specificity[,]' and 'on a fact-specific, case-by-case basis[.]'" *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (alterations in original) (quoting *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997)).

With respect to the first prong, the Court has already determined that there are questions of fact as to whether Vincente's affirmative actions created a "state-created danger" and, therefore, there is an unresolved factual dispute as to whether a substantive due process right was

violated. But even with the possible existence of a constitutional violation, qualified immunity would still protect Vincente so long as the rights at issue herein were not clearly established.

Plaintiffs maintain that the substantive due process right of school children to "personal security and to bodily integrity[,]" is well established. (Doc. No. 93 at 3993, quoting authority.) They argue that "the Sixth Circuit has clearly established that children in school have the substantive due process right not to be abused, and that school officials' abusive conduct furthering no legitimate government purpose should go to a jury if there is any genuine issue of material fact." (*Id*., citing *Hunt*, 542 F.3d at 543). Plaintiffs further posit that "the right to be free from excessive corporal punishment in the school setting, particularly where it is not administered for any pedagogical purpose, is clearly established." (*Id*., citing *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987); Ohio Rev. Code § 3319.41 ).

The Court would agree that, at a general level, the rights identified by plaintiffs—"freedom from abuse, corporal punishment, and excessive force"—were clearly established. (*See* Doc. No. 93 at 3993.) But the qualified immunity analysis demands a more "particularized" approach. *White*, 137 S. Ct. at 552. Plaintiffs have failed to identify any controlling caselaw from the Sixth Circuit or the Supreme Court, or even persuasive authority from other jurisdictions, that would support a finding that Vincente was on notice of the unlawfulness of the conduct in the mandated "particularized sense" or that she was "plainly incompetent" for failing to protect M.J. from the actions of Hendon. Specifically, plaintiffs fail to identify any case wherein school officials were held responsible for failing to prevent an imposter posing as a police officer from abusing a child. *See Jackson*, 429 F.3d at 592 (finding constitutional right not clearly established where no case law in existence involving substantially similar circumstances). The Court

concludes that Vincente is entitled to qualified immunity on the remaining federal claim of substantive due process.[35]

### E.     State Law Claims and Defaulted Party

The Court, having dismissed all claims over which it had original jurisdiction, declines to exercise supplemental jurisdiction over the state law claims. These claims are dismissed without prejudice and with leave to refile them in a state court of appropriate jurisdiction. 28 U.S.C. § 1367(c) (providing that a court "may decline to exercise supplemental jurisdiction," if it has "dismissed all claims over which it has original jurisdiction"); *see Carneigie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims").    F

Further, in light of the foregoing, the Court, on its own motion, reconsiders its entries of default against Hendon (*see* the W.H. Case, Doc. No. 23; the M.J. Case, Doc. No. 39), and dismisses the claims against him in the same manner as it has dismissed the parallel claims against other defendants. *See* Fed. R. Civ. P. 55(c) ("The court may set aside an entry of default for good cause"); *see, e.g., Hanming Feng v. Soy Sauce LLC*, No. 15-CV-3058 (ENV) (LB), 2017 WL 6561160 (E.D.N.Y. Dec. 11, 2017) (vacating entry of default against one party where court had dismissed all federal claims and declined to exercise supplemental jurisdiction over state claims).

---

[35] While the Court concluded that Morrison's and Ramon's actions did not support a substantive due process violation, had the Court found that the facts supported such a violation, Morrison and Ramon would have been entitled to qualified immunity for the same reasons.

## VI. CONCLUSION

For the foregoing reasons, the Court's disposition of the summary judgment motions is as follows:

In Case No. 5:18-cv-577 (the M.J. Case), defendants' motions for summary judgment (Doc. Nos. 86, 87) are GRANTED IN PART. All federal claims are DISMISSED WITH PREJUDICE, and the state law claims are DISMISSED WITHOUT PREJUDICE. The default judgment against Hendon (Doc. No. 23) is VACATED.

In Case No. 5:18-cv-870 (the W.H. Case), defendants' motions for summary judgment (Doc. Nos. 99, 102) are GRANTED IN PART. All federal claims are DISMISSED WITH PREJUDICE, and the state law claims are DISMISSED WITHOUT PREJUDICE. The default judgment against Hendon (Doc. No. 39) is VACATED.

Separate judgment entries in each case will issue.

**IT IS SO ORDERED**.

Dated: April 28, 2020

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**